UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20715-CR-COOKE

UNITED STATES OF AMERICA

vs.

CHARLES K. TOPPING
        a/k/a "Charlie Kenn"
ANITA SGARRO,
        a/k/a "Anita Simone"
CHARLES DAVID SMIGROD
        a/k/a "Charles David"
MATHEW WILLIAM WHEELER
        a/k/a "Mathew Williams"
James Wayne Long
        a/k/a "J.W. Long,"


        Defendant.
_____ /


GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR A NEW TRIAL AND SGARRO'S MOTION FOR A
POST-VERDICT JUDGMENT OF ACQUITTAL ON COUNTS TWO AND TEN

Defendants were convicted of participating in a complex six-year, $23 million scheme to

defraud senior citizens, farmers and other vulnerable victims through the sale of stock in two

companies: Sanomedics and Fun Cool Free. The Defendants lied to their victims about numerous

material facts, including lying that: (1) victims were buying stock in established profitable

companies earning "$10 million in revenues," (2) the companies were doing "clinical trials" at

prestigious universities and hospitals, (3) the companies were run by successful business people

such as John Scully and Philip Frost and endorsed by celebrities such as Cesar Millan, (4) the

victims would be able to sell their stock in 3-6 months, (5) Sanomedics and Fun Cool Free would

soon be trading on the NASDAQ or the AMEX, (6) that Defendants worked for the companies in investor relations, and (7) that there were "no commissions, we're only paid in stock," leading victims to believe that all of their investment would be used to grow and expand the companies.

Defendants now challenge their convictions on legal grounds, admitting that they lied about material facts but claiming that the Court erred by failing to include the precise language they requested in their "theory of defense" instruction to the jury. However, their requested instruction distinguishing between intent to deceive versus intent to defraud was legally incorrect, already substantially covered by the Court's other instructions, and in any event, the absence of such an instruction did not impair Defendants' ability to defend themselves. *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) did not change the law or the applicable Eleventh Circuit Pattern Jury Instructions for mail and wire fraud. Indeed, the Eleventh Circuit Committee revised the Pattern Jury Instructions six months ***after*** the *Takhalov* decision was issued and—despite making other significant changes to the mail fraud instructions—chose *not* to alter the instructions on intent and scheme to defraud, the same instructions Defendants claim are inadequate here. At bottom, the issues unique to *Takhalov* were neither properly raised by Defendants nor implicated in this straight forward investment fraud case, and the Second Circuit decisions cited by Defendants and quoted in *Takhalov*—along with the decades of precedent interpreting them—firmly support the Government's position.

Sgarro's challenge to her convictions for wire and mail fraud on Counts Two and Ten are equally meritless. The Government presented extensive evidence supporting the jury's verdict that Sgarro was guilty of mail and wire fraud and conspiracy to commit mail and wire fraud. Sgarro is incorrect that the only evidence supporting her participation in these counts is testimony regarding interactions her co-schemer, Craig Sizer, had with the victims. The totality of the

evidence—including the testimony of multiple witnesses and Sgarro's own emails—was more than sufficient to permit the jury to find Sgarro guilty on these counts.

Defendants' motions should be denied.

## RELEVANT FACTUAL BACKGROUND

Defendant Sgarro was convicted by a jury on June 22, 2017, on three counts in the Indictment: Count One (conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349), Count Two (mail fraud, 18 U.S.C. § 1341), and Count Ten (wire fraud, 18 U.S.C. § 1343). Sgarro now moves for a judgment of acquittal under Fed. R. Crim. P. 29(c) on Counts Two and Ten, *see* ECF No. 569, and for a new trial under Fed. R. Crim P. 33, *see* ECF No. 568, which her co-defendants Topping and Smigrod join, *see* ECF Nos. 584 (Topping) and 571 (Smigrod).[1]

During the nearly two-month jury trial in this case, the Government presented overwhelming evidence that Defendants and their co-schemers knowingly told numerous material lies to induce more than 700 victims to purchase stock in Sanomedics and Fun Cool Free. This evidence included the testimony of more than 30 witnesses, thousands of pages of documents seized from the boiler room, and dozens of pages of contemporaneous notes written by victims during their calls with Defendants. In exchange for emptying their retirement accounts, Defendants told victims that they would receive stock in established profitable companies earning "$10 million in revenues," conducting "clinical trials" at prestigious universities and hospitals, and run by successful business people such as John Scully and Philip Frost and endorsed by celebrities such as Cesar Millan. Defendants told victims that they would be able to sell this stock in 3-6 months, that these companies would soon be trading on the NASDAQ or the AMEX, two

---

[1] Although Smigrod also seeks to join Sgarro's motion for a judgment of acquittal on Counts Two and Ten, *see* ECF No. 572, Smigrod is not named in either of those substantive counts and provides no reason why that motion should apply to him. Accordingly, the Government also opposes Smigrod's motion to adopt Sgarro's motion for a judgment of acquittal on Counts Two and Ten.

prestigious stock exchanges and, importantly, that Defendants worked "for the company in investor relations," made "no commissions," and were "only paid in stock," leading victims to believe that all of their investment would be used to grow and expand the companies.  But Defendants knowingly lied about each of those facts.

What the victims received instead were shares of unsellable restricted stock in fledgling companies with negative revenues, no celebrity endorsements, no clinical trials, no famous or successful businessmen "at the helm" or on the Board, and no "investor relations" departments. What they received was stock in companies that did not ever come close to qualifying for the NASDAQ or AMEX.  And, critically, instead of all the victims' money going into the companies as they were told, each of the Defendants stole at least 20-25% of the victims' money as undisclosed commissions.  And no Defendants were ever paid in stock.

The Government also presented substantial additional evidence of Defendants' intent to defraud and consciousness of guilt, including that:

- Each Defendant knew that at least 50% of the victims' money was being misappropriated for sales commissions, and that victims would never be able to sell their stock;

- Mike Mesa instructed Defendants "don't pitch the bitch" and "don't pitch to stock brokers, lawyers, financial people," or law enforcement;

- Among themselves, Defendants referred to the pitch they gave to victims as "the setup";

- Mike Mesa was a pathological liar and a career con man, yet Defendants continued working for him;

- Topping, Smigrod and Wheeler sold Sanomedics stock for years, watched victims lose all their money, knew without any doubt it was a fraud, and then went straight into selling Fun Cool Free, Mesa and Sizer's next fraud;

- After the Sanomedics stock crashed, Topping told Juan Perez that "if any law enforcement come knocking, just tell them you didn't know anything;"

- During an interview, Topping asked FBI special agent Bill Brown if his liability could be limited to only the victims he sold to;

- Smigrod purchased a "burner phone" *after* the FBI raided the Fun Cool Free room so he could continue selling Fun Cool Free stock;

- Sgarro told victim Girard Secker that "if you report me to the authorities, I'll just deny it;"

- Long was convicted of wire and mail fraud in 2006 for orchestrating a similar boiler room scheme;

- Four of the five Defendants used false names when speaking to investors.

Defendants concede that they told victims numerous material lies to obtain money, *see* ECF No. 569 at 5-6,[2] but contend that because victims technically received the "shares" they bargained for at the "exact price quoted," *see* ECF No. 568 at 7, Defendants only executed a scheme to deceive rather than a scheme to defraud. Relying on *Takhalov*, Defendants asked the Court to deliver a confusingly worded jury instruction steeped in legalese including, *inter alia*, about the "difference between deceiving and defrauding" and that "if a defendant does not intend to harm the victim… then the defendant has not intended to defraud the victim." *See* Defs.' Proposed Instr., ECF No. 568-1. While the Court ultimately delivered a revised version of this instruction, it rejected the precise wording proposed by Defendants.

Defendants now claim that the Court erred by failing to instruct the jury with the exact language they requested, and Sgarro claims the evidence was insufficient to convict her on Counts Two and Ten. Not so.

## <u>ARGUMENT</u>

## I.   THE COURT DID NOT ERROR IN DENYING DEFENDANTS' REQUESTED JURY INSTRUCTION

The denial of a jury instruction is reviewed for abuse of discretion, and the Court of Appeals "will reverse only if (1) the requested instruction correctly stated the law; (2) the actual

---

[2] For example, Sgarro concedes in her motion that she told investors that "she worked for Sanomedics and was not paid a fee on the sale of the stock," which she admits "was also false." *Id*. at 6.

charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *United States v. King*, 751 F.3d 1268, 1275 (11th Cir. 2014) (internal quotation marks omitted). Defendants fail to "sustain[] [their] burden of showing that the district [court] committed reversible error" under any prong of this analysis. *United States v. Martinelli*, 454 F.3d 1300, 1315 (11th Cir. 2006).

### A.  Defendants' Proposed Instruction Was an Incorrect Statement of the Law.

To prove mail and wire fraud, the United States must establish that the defendant intentionally (1) participated in a scheme or artifice to defraud and (2) used the interstate wires or mails to carry out that scheme. *See United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009); *United States v. Hasson*, 333 F.3d 1264, 1270-71 (11th Cir. 2003).  "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Maxwell*, 579 F.3d at 1299; *see also United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009).

Although the statute does not define "a scheme to defraud," the Supreme Court has explained that the words "refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358 (1987) (internal quotation marks and citation omitted).  The statute requires "the object of the fraud to be 'property' in the victim's hands[.]" *Cleveland v. United States*, 531 U.S. 12, 23-26 (2000).

Defendants' proposed jury instruction regarding the wire and mail fraud charges was an incorrect statement of the law and had no application to the facts of this case.

*First*, the wire and mail fraud statutes do not require that a defendant intend to cause harm and financial loss to their victims, as Defendants' proposed jury instruction stated. As the Eleventh Circuit explained in *Maxwell*, "financial loss is not at the core of" mail and wire fraud. 579 F.3d at 1302. "Instead, the statutes also seek to punish the intent to obtain money or property from a victim by means of fraud or deceit." *Id*; *see also United States v. Binday*, 804 F.3d 558, 579 (2d Cir. 2015) ("it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss—it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision.") *cert. denied*, 136 S. Ct. 2487 (2016).

The Supreme Court's decision in *Carpenter v. United States*, 484 U.S. 19 (1987), demonstrates that a defendant who deceives another solely out of a desire to enrich himself still violates the mail fraud statute. In that case, the Supreme Court held that Winans, the author of an investment column for the Wall Street Journal, violated the mail fraud statute when he used the Journal's confidential information to trade in stocks before the information was published and knowing the publication's probable effect on the market. The Supreme Court found that Winans deceived the newspaper by appropriating its confidential business information for his own use and profit, but found that he was motivated by his desire to enrich himself rather than to harm the Journal. *See id*. at 27-28 (Court focuses on anticipated gain to Winans as critical aspect of the scheme). The Supreme Court endorsed the district court's conclusion that "each of the petitioners acted with the required specific intent to defraud." *Id*. at 28.

Because Defendants' requested instruction—that a specific intent to defraud requires proof that the defendants intended to harm their victims—was incorrect, the Court did not error in refusing to provide it in the manner requested by Defendants.

The incorrectness of Defendants' proposed instruction is further highlighted by the most recent revision to the Eleventh Circuit Pattern Jury Instructions, published ***six months after*** *Takhalov* was decided. *See* Committee's Pattern Jury Instructions, Criminal Cases, Eleventh Circuit (December 9, 2016 revision) at 3 (relevant portions attached hereto as Exhibit 1). Although the Eleventh Circuit Committee made other substantial changes to the mail fraud instructions concerning Honest Services fraud, *see id.* at 50.2, the Committee left undisturbed the mail fraud instructions at issue here, including the instruction on intent to defraud. Accordingly, that Instruction still reads: "[t]o act with 'intent to defraud' means to act knowingly and with the specific intent to deceive or cheat someone, usually *for personal financial gain* or to cause financial loss to someone else." *Id*. at 50.1 (emphasis added). Those instructions are still the correct and applicable law as stated by the Eleventh Circuit after *Takhalov* and are directly contradicted by the erroneous instruction proposed by Defendants.

Accordingly, the Court committed no error by denying Defendants' proposed instruction. "It is not the function of the trial judge to put lengthy, confusing or inaccurate requests for instructions through a winnowing or sifting process in an endeavor to select what is good and reject what is bad. If a proffered request is in any respect incorrect, the denial of such a request is not error." *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965).

*Second*, Defendants' core misrepresentations here were clearly intended to defraud and cannot in any stretch be characterized as intended merely to deceive. Accordingly, the unique factual and legal issues addressed in *Takhalov* were not present in this case, and Defendants' confusingly worded jury instruction addressed to those issues was unwarranted. "Calling a proposed instruction a 'theory of defense' does not automatically require that it be given in those words. If the instruction does not concern factual issues properly before the jury or if it is otherwise

confusing, it need not be given at all." *United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir. 1984) (quoting *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir.), *cert. denied*, 444 U.S. 846 (1978)).

In *Takhalov*, the Court of Appeals applied the statutory mail fraud language and existing case law to the defendants' claim that the district court had erroneously refused to give a requested theory-of-defense instruction.  The defendants in that case had testified at trial that, as mere investors, they had no knowledge of the many instances of fraudulent conduct underway at the Miami Beach bars and nightclubs in question.  For instance, "employees would pour vodka in the men's beer to get them drunker, misrepresent the prices of drinks, hide menus, cover up prices, and even forge the men's signatures on credit-card receipts."  827 F.3d at 1310.  The defendants testified they knew of only one misrepresentation—that the beautiful women who lured men into the club from the strip (the "bar girls or B-girls") were not "tourists" but were in fact paid by the club to get men to enter.  *See id*.  The defendants argued that this misrepresentation alone could not form the basis of a fraud conviction, *id*. at 1311, and sought an instruction specifically to that effect, which the trial court refused to give.

On appeal, the Eleventh Circuit found that the district court erred by failing to instruct the jury that, on its own and distinct from the other instances of fraudulent conduct allegedly unknown to the defendants, the failure to disclose the B-girls' status as paid employees was insufficient to convict the defendants of fraud.  *Id*. at 1321.  In other words, the Eleventh Circuit found that the B-girls' instruction was necessary because, *as a matter of law*, Defendants could not be convicted of fraud solely for failing to disclose the B-girls' status as paid employees of the bar.  In support of this narrow holding, the court explained that a scheme to defraud "refers only to those schemes in which the defendant lies about the nature of the bargain itself."  *Id*. at 1313.  "That lie can take

two primary forms: the defendant might lie about the price (*e.g.*, if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium).  In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud." *Id*. at 1313-14.  However, the court further remarked that "if a defendant lies about something else—*e.g.*, if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone."  *Id*. at 1314.

Defendants cite two Second Circuit decisions relied on in *Takhalov* in further support of their argument that they were entitled to a jury instruction explaining the difference between deceiving and defrauding: *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) and *United States v. Regent Office Supply Co., Inc.*, 421 F.2d 1174 (2nd Cir. 1970).  The *Takhalov* court expressly stated its intent to address "the precise question that the Second Circuit considered in *Regent* and that is presented here."  827 F.3d at 1315.  Similar to *Takhalov, Regent* and *Starr* have been readily distinguished from the facts in this case, including by decades of Second Circuit precedent.

In *Regent*, the scheme involved stationery salesmen telling "white lies" to get past secretaries so they could speak to purchasing agents, lying to customers about the reasons why they were able to offer a specific bargain or deal on stationery, falsely telling customers that a friend of the customer had referred the salesmen to the customer, and stating other, similar, fictions.  421 F.2d at 1176-77.  The defendants, however, never made any false representations about the quality or price of the stationery, leading the court to conclude that although the defendants had an intent to deceive the purchasers and induce them into purchases, the government did not show an intent to defraud.  *See id*. at 1177, 1181-82.  The court noted that "[defendants']

agents did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain." *Id*. at 1182.

In *Starr*, the defendants processed bulk mailings for their customers and ran a scheme where they underpaid the Post Office for the mailings, but misrepresented to their customers that the full mailing price had been paid to the Post Office and charged their customers for the full mailing price.  816 F.2d at 96.  Although the Post Office was clearly defrauded by this scheme, the government's only theory was that the victims of the scheme were the bulk mailing customers, even though the mailings all arrived on time and at their proper destinations.  *See id*. at 99, 101-02.  The court overturned the defendants' convictions, holding that although the defendants deceived their customers, this was not a crime because the customers received all of the services that they bargained for and had no right to claim a refund for monies not paid to the postal service as those monies were, essentially, illegal proceeds from a fraud.  *See id*. at 99-100.  The court explained that the "[t]he misappropriation of funds simply has no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion."  *Id*. at 100.  The court went on to stress that, "[a]s in *Regent*, no evidence of tangible injury was shown from which the jury could infer an intent to defraud."  *Id*. at 101.

Defendants focus on the courts' statements in *Starr*, *Regent* and *Takhalov* that "the harm contemplated must affect the very nature of the bargain itself."  *Starr*, 816 F.2d at 98.  According to Defendants, the nature of the bargain here was limited to the price of the purchased stock and the receipt of the stock certificate and, thus, they claim no fraud occurred because the victims received what they bargained for.

As stated by one court in rejecting a nearly identical argument, "Defendants' theory is flawed—no case has even hinted that the rationale underlying this line of precedent should be

employed in the manner defendants suggest." *United States v. Weaver*, No. 13-CR-120, 2016 WL 3906494, at *9 (E.D.N.Y. June 10, 2016) *aff'd*, 860 F.3d 90 (2d Cir. 2017).  Rather, *Starr*, *Regent* and *Takhalov* stand for the unremarkable proposition that where: (a) the misrepresentations were "only collateral to the sale and did not concern the quality or nature of the goods being sold," and (b) "[t]he customers received exactly what they paid for and no customer testified that he had been cheated," the defendant did not "contemplate an actual injury to the alleged victims of the fraud," and therefore the evidence was insufficient to demonstrate intent to defraud.  *Starr*, 816 F.2d at 98 (citing *Regent*, 421 F.2d at 1181).  In other words, this line of precedent has been confined to cases where the alleged misrepresentations did not concern the nature, price or quality of the goods sold *and* the alleged victims obtained the exact stationery, mail services, or B-girls for which they bargained and thus were not actually harmed by the scheme, making it necessary for the government to independently prove intent to harm (since intent could not be inferred from the harm itself).  *See, e.g.*, *United States v. Kinney*, 211 F.3d 13, 18 (2d Cir. 2000) (distinguishing *Starr* where the victims sustained losses based on misrepresentations "about how their money would be spent, and made a decision whether to donate money based on that information.").

The Defendants' boundless lies in this case were not mere deceit, as they contend, because they struck at the heart of the victims' bargain by mischaracterizing the essence of the stock purchase.  Defendants lied about company revenues, clinical trials, corporate management, celebrity endorsements, that the stock would trade on prestigious exchanges, and about being paid solely in stock, all so that victims would believe the stock they were buying was far more valuable than it actually was.  They lied about the stock restriction so victims would believe that they could sell the stock in 3-6 months.  They lied about their exorbitant commissions to make victims believe that all of their investment would be used to grow and expand the companies.  As *Regent*

acknowledged, a scheme can be unlawful under the mail and wire fraud statutes where the falsity of the representation is capable of "influencing [the victim's] assessment of the value of the bargain to him" or there is a "suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased." 421 F.2d at 1180.  And subsequent decisions from the Second Circuit have made clear that an inference of fraudulent intent can arise "where the defendant's misrepresentations foreseeably concealed economic risk or deprived the victim of the ability to make an informed economic decision."  *Binday*, 804 F.3d at 578-79 (affirming fraud convictions of defendants who "knew that their misrepresentations induced the insurers to enter into economic transactions – ones that entailed considerable financial risk – without the benefit of accurate information" and finding that "it suffices that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision").[3]  Thus, the jury could have easily inferred an intent to defraud where, as here, the Defendants' misrepresentations and omissions concerned "potentially valuable economic information," "affected the victim's economic calculus," or "exposed" the victim to "unexpected economic risk."  *Id.* at 570–71.

In this case, the stock victims received was worth much less than the price they paid and dramatically less than Defendants represented.  Indeed, the stock was entirely worthless because

---

[3] *See also Kinney*, 211 F.3d at 19 (affirming fraud conviction where defendants' dishonesty was not incidental to the contributors' decision to make donations to a charity, but was aimed at influencing those decisions directly); *Seizure of All Funds in Accounts in Names Registry Pub. Inc.,* 68 F.3d 577, 582 (2d Cir. 1995) (distinguishing *Regent* where "membership in the registries may not have provided the members with the full networking capability that they expected to receive from the Companies."); *United States v. Pritchard,* 773 F.2d 873, 878 (7th Cir. 1985) (distinguishing *Regent* where misrepresentation was not collateral to the bargain but "went to its heart" because it constituted "crucial misinformation" upon which the victim relied in making its decision to ship goods to the defendant); *United States v. Tarallo,* 380 F.3d 1174, 1183 (9th Cir. 2004) (Distinguishing *Regent* where "Defendant's misrepresentations were designed to give a false impression as to the size and nature of his own company as well as the businesses in which victims were being asked to invest."); *United States v. Finazzo,* No. 10-CR-457, 2013 WL 619571, at *6 (E.D.N.Y. Feb. 19, 2013) (denying motion to dismiss indictment because even though the ultimate contract may have been fulfilled as written, "it is wholly inappropriate to divorce the final contract from the deception involving an 'essential element' underpinning that bargain").

of the trading restriction, and the victims ultimately sustained massive financial losses. *See Regent*, 421 F.2d at 1181 (noting that "proof that someone was actually victimized by the fraud is good evidence of the schemer's intent"); *United States v. Weaver*, 860 F.3d 90, 96-97 (2d Cir. 2017) ("'[P]roof of actual harm befalling the victim as a result of the scheme … may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm.'") (quoting *United States v. Rybicki*, 287 F.3d 257, 262 (2d Cir. 2002)). Thus, this case is unlike *Regent*, *Starr* and *Takhalov*, where the misrepresentations were collateral and did not result in any actual harm because the customers received the stationery, mail services and B-girls they wanted. Here, Defendants' misrepresentations related to the stocks' value, tradability, and use of the victims' investments and caused victims devastating harm—many lost their life savings and at least one contemplated suicide.

Accordingly, because numerous victims were harmed and because "[D]efendants' dishonesty was not incidental to the [victims'] decision" to invest "but rather was aimed at influencing those decisions directly, an intent to defraud was established" and "*Starr* and *Regent* [and *Takhalov*] have no application." *See Kinney,* 211 F.3d at 18-19 ("We cannot agree with defendants that these misrepresentations" about "how [victims'] money would be spent" "did not affect the [victims'] understanding of their bargain with [Defendant] and mislead them as to the nature and quality of [Defendant's] activities. In such circumstances, we have not hesitated to hold that *Starr* and *Regent* have no application."); *United States v. Fullwood*, No. 16-CR-48, 2016 WL 5106940, at *7 (M.D. Fla. Sept. 20, 2016) ("[T]his case is distinguishable from *Starr* and *Takhalov* because in this context, as opposed to the purchase of a good or service, a contributor's expectation about how his donation will be used does go to the essence of the bargain itself."); *United States v. Johnson*, No. 14-CR-238, 2017 WL 930633, at *7 (E.D. La. Mar. 9, 2017)

("Unlike the misrepresentations in *Regent Office Supply Company* and *Takhalov*, Defendants' alleged misrepresentations in this case amount to fraud.  Their false representations (1) fundamentally altered both the insurance companies' and the customers' understanding of the bargain, (2) influenced the insurance companies' and customers' assessment of the value of the bargain to them, and (3) amounted to lies about the "characteristics of the good" at issue (the legitimacy of the bond and the value of any underlying guarantee that the inmates released on these illegitimate bonds would honor their commitment to subsequently appear before the court)"); *cf. Martinelli*, 454 F.3d at 1317 (upholding trial judge's refusal to instruct on the puffing defense, noting that the evidence "cannot in any stretch be characterized as mere puffery or just a sales pitch" because misrepresentations "were factual statements that were verifiably refutable").

Finally, not a single Second Circuit case before or after *Regent* and *Starr*, and not a single Eleventh Circuit case since *Takhalov,* has approved of a jury instruction remotely similar to the confusing legalese proposed by Defendants here.[4]  Indeed, the *Takhalov* court itself considered a simple and factually pointed instruction: "Specifically, [defendants] asked the court to instruct the jury that '[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]'" *Takhalov*, 827 F.3d at 1311. Defendants could have proposed such an instruction here.  Instead, their proposed instruction was overbroad, steeped in confusing legalese, and grossly misstated the law, and the Court properly denied it.  *See United States v. Dobek*, 789 F.3d 698, 700 (7th Cir. 2015) (Posner, J.) (admonishing district court for its failure to simplify "proposed wordy instructions in legalese" that were "wholly

---

[4] For example, Defendants' proposed instruction stated, in part: "There is a difference between deceiving and defrauding: to defraud, one must intend to use deception to cause some injury.  But one can deceive without intending to harm at all.  One can deceive without defrauding.  A 'scheme to defraud' refers only to those schemes in which a defendant lies about the nature of the bargain itself. . . . the deceit must be coupled with a contemplated harm to the victim that affects the very nature of the bargain itself.  Such harm is apparent when there is a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered or intended to deliver."  *See* ECF No. 568-1.

unsuitable for a jury; jurors are not lawyers and jury instructions should steer clear of legal jargon.") *cert. denied*, 136 S. Ct. 272 (2015).[5]

In *Weaver*, the court refused to give a proposed defense instruction in an investment fraud case that used confusing legalese from *Regent* and *Starr* virtually identical to the instruction proposed by Defendants here:

> At trial, defendants requested the following instruction based on *Regent* and its progeny: "An intent to deceive, and even to induce a customer to make a purchase does not, without more, constitute the intent to defraud a customer. A defendant can intend to deceive a customer without intending to defraud them. For example, statements that deceive a customer about the reason for offering a bargain are not intended to defraud. Instead, a statement is only intended to defraud if it goes to the nature of bargain itself as reflected in the contract between customers and Vendstar, such as the quality, adequacy, or price of the goods to be sold."

2016 WL 3906494, at *9, *aff'd*, 860 F.3d 90 (2d Cir. 2017). Despite the language in *Regent* and *Starr*—the exact same language quoted in *Takhalov* and Defendants' theory of defense instruction—the court concluded that the defendants' proposed instruction was "clearly an incorrect statement of the law" and that "'it is not the function of the trial judge to put lengthy, confusing or inaccurate requests for instructions through a winnowing or sifting process in an endeavor to select what is good and reject what is bad. If a proffered request is in any respect incorrect, the denial of such a request is not error.'" 2016 WL 3906494 (quoting *Kelly*, 349 F.2d at 759). The court concluded that "[t]he schemes in *Regent* and *Starr* are nothing like [this] fraud, in which the customers were pitched a business opportunity, the misrepresentations concerned … projected earnings and other facts relevant to profitability, customers suffered tangible injury, and

---

[5] Further, in *Takhalov* and the other cases cited by the Defense, defendants themselves took the stand and testified that they had no intent to defraud. Here, by contrast, no defendant testified and thus no evidentiary foundation was laid to support an intent-based theory of defense. *See, e.g., United States v. Williams*, 728 F.2d 1402, 1405 (11th Cir. 1984) (finding no "underlying evidentiary foundation to support [defendant's] requested instruction on good faith" because defendant "did not testify" and thus presented "a good argument for lack of motivation, but no real evidence of lack of intent" to support a theory of defense instruction).

there was ample evidence of intent to defraud." *Id.* The Court should reach the same conclusion here under these substantially similar facts.

### B. The Court's Jury Instructions as Given Substantially Covered the Issue of Intent to Defraud in the Charged Offenses.

"In determining whether an instruction substantially covered the proposed instruction," the Court "need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and the law." *King*, 751 F.3d at 1275 (quoting *United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992)). "Whether a given instruction substantially covered a requested one depended on 'the size of the logical leap that a juror would need to make to get from the instruction the court gave to the instruction the defendant requested.'" *United States v. Woodard*, 662 F. App'x 854, 869 (11th Cir. 2016) (quoting *Takhalov*, 827 F.3d at 1318).

Here, the logical leap between the given and requested instructions was well within the ability of the jury to make and was far smaller than the leap found problematic in *Takhalov*. The jury was instructed (over the Government's objection) regarding the core issues about which Defendants now complain: "Defendants contend that there is a difference between deceiving and defrauding. To defraud defendants must have intended to use deception to cause financial harm to investors." *See* Final Jury Instructions. The Court's further instructions that "'intent to defraud' means to act knowingly and with the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else," that "[a] 'material fact' is an important fact that a reasonable person would use to decide whether to do or not do something" and "[a] fact is 'material' if it has the capacity or natural tendency to influence a person's decision," adequately addressed the defendants' theory of defense—that they lacked the intent to defraud their victims because they did not believe the statements were false and that the victims received the benefit of their bargain. *See United States v. Hill*, 643 F.3d 807, 852-54 (11th Cir. 2011)

(upholding jury instructions where jury had to infer that a person cannot lie "willfully" if he speaks what he believes to be the truth); *Martinelli*, 454 F.3d at 1315-16 (upholding instructions where jury had to infer that mail fraud was not legitimate business); *United States v. Rochester*, 898 F.2d 971, 978–79 (5th Cir. 1990) (finding no reversible error where the trial court refused to instruct on good faith, but did instruct on the definition of willfully and intent to defraud).

Both individually and "when viewed as a whole," the Court's instructions "fairly and correctly" directed the jury to find Defendants guilty only if it concluded that they made the material misrepresentations knowingly, with intent to defraud. *See King*, 751 F.3d at 1275. In *Hill*, the Eleventh Circuit explained that a court's instructions on willfulness substantially covered a requested good-faith instruction where "based on the instructions the district judge gave, if the jury had concluded that the defendants had a good faith belief in the legitimacy of the scheme, it could not have found that they made the false statements willfully." 643 F.3d at 854; *see also Martinelli*, 454 F.3d at 1315-16 (similar). So too here, if the jury had concluded that the evidence established that Defendants had only "deceived" victims about unimportant (*i.e.*, immaterial) facts that did not go to the nature of the bargain, it could not have convicted them under the instructions given.

### C. Defendants Have Failed to Demonstrate That the Failure to Give Their Proposed Instruction Seriously Impaired Their Ability to Present an Effective Defense.

Nor have Defendants shown that the failure to give their proposed (and incorrect) instruction precisely as written constituted a "point in the trial so important" that defendants were "seriously impair[ed]" in defending themselves. *Takhalov*, 827 F.3d at 1316. *Cf. United States v. LaFond*, 783 F.3d 1216, 1224-25 (11th Cir. 2015) (no error in rejecting requested instruction

where the defendant had not introduced evidence regarding retreat and the "government never suggested that [the defendant] should have retreated").

Defendants remained free to argue—and indeed, did argue—that because Defendants "did not want any harm to come to these investors" they had no intent to defraud. *See* Closing Argument of Scott Sakin; *see also Martinelli*, 454 F.3d at 1316 (noting that the defendant's "attorney actually argued good faith to the jury in his closing"). No further instruction was necessary to convey these issues to the jury. Defendants are not "entitled to a judicial narrative of [their] version of the facts, even though such a narrative is, in one sense of the phrase, a 'theory of the defense.'" *United States v. Barham*, 595 F.2d 231, 244 (5th Cir. 1979).

Particularly in light of the "overwhelming" evidence of Defendants' intent to defraud and the comparatively "slight" evidence that they merely intended to deceive, there is no basis to conclude that the failure to give an instruction delineating between deceiving and defrauding in precisely the manner requested by Defendants "seriously impair[ed] [their] ability to defend" themselves. *See Martinelli*, 454 F.3d at 1316 (failure to give requested good-faith instruction did not seriously impair defense where "the evidence of fraud … was overwhelming and the evidence of good faith was slight"); *United States v. De La Mata*, 266 F.3d 1275, 1300 (11th Cir. 2001) (reviewing "the underlying evidence" and concluding that in light of such evidence "and the district court's specific intent instructions, we find no abuse of discretion" in denying a proposed instruction regarding good faith).

## II.    SGARRO IS NOT ENTITLED TO RELIEF ON COUNTS TWO AND TEN

Sgarro is also not entitled to relief on Counts Two and Ten based on her assertion that she did not directly sell to Aurelia Ostro or Girard Secker on the occasions cited in the indictment. In *United States v. Munoz*, the Eleventh Circuit held that the "crime of mail fraud does not include an element requiring a contemplated harm to a specific, identifiable victim." 430 F.3d 1357, 1369

(11th Cir 2005).  Thus, in the context of an evidentiary sufficiency challenge, the court concluded that it was "irrelevant whether or not [the defendants] personally knew of, communicated with, or directed activities towards the six named victims."  *Id.*  Rather, evidence showing that the defendants participated in a scheme to defraud all buyers of a product, combined with the fact that the six named victims did in fact purchase the product, was all that was needed to sustain the defendants' convictions.  *Id.*; *see also United States v. Royal*, 100 F.3d 1019, 1030 (1st Cir. 1996) (flatly rejecting the notion that the government is obliged to prove in a mail fraud prosecution that the defrauders intended to defraud a specific victim because the mail fraud statute "requires only that there be a scheme to defraud…").

To the extent that Sgarro's argument is really attempting to attack causation—*i.e.*, the requirement that the admitted fraud caused the wires and mailings at issue—it too fails.  Sgarro sold Ostro and Secker on a too-good-to-be true stock opportunity based on material lies, including that Sanomedics made "$10 million" in revenues, that Cesar Millan was endorsing the company, and that Sanomedics was performing clinical studies with prestigious institutions.  As a result, Secker and Ostro and Sgarro's other victims lost millions of dollars after purchasing Sanomedics stock through either Sgarro herself, Craig Sizer, or Charles Topping.  The causal link (and foreseeability) could not be clearer.  *See United States v. Castillo*, 829 F.2d 1194, 1198-99 (1st Cir. 1987) (explaining that "[w]hether or not the appellant had foreknowledge of the precise series of [electronic communications] ... is beside the point," and stressing that "[a]s long as some use of [wires] in the course of the endeavor was reasonably to be anticipated, the causation requirement is met").

Sgarro, moreover, is guilty of fraud if she aided or abetted it.  *See* 18 U.S.C. § 2; *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015) (defendant is guilty by aiding and abetting if

(1) someone committed the offense; (2) defendant contributed to and furthered it; and (3) defendant intended to aid in its commission).  Evidence supporting Sgarro's conviction under an aiding-and-abetting theory may be direct or circumstantial, and she is guilty of aiding and abetting even if she did not personally commit all the acts constituting the fraud.  *See id*. at 1293.

Sgarro brought Ostro and Secker into Sanomedics and loaded them for hundreds of thousands of dollars.  Even if, as she claims, she did not directly solicit Ostro or Secker on the specific occasions listed in Counts Two and Ten, she certainly facilitated those sales by passing both victims off to her co-schemer, Craig Sizer, when she was unable to load them anymore.  That evidence was sufficient for the jury to convict her on the challenged Counts.

## **CONCLUSION**

For the foregoing reasons, Defendants' requests for post-trial relief should be denied.

Respectfully submitted,

BENJAMIN GREENBERG
ACTING UNITED STATES ATTORNEY

/s/ Roger Cruz
Roger Cruz
Assistant United States Attorney
Florida Bar Number 157971
99 Northeast 4th Street
Miami, Florida 33132
Telephone: 305-961-9207
Facsimile: 305-536-4699
Email: roger.cruz@usdoj.gov

/s/ Ryan D. Tansey
Ryan D. Tansey (A5502279)
Kevin B. Hart (A5501875)
Trial Attorneys
United States Department of Justice
450 5th Street, N.W.
Washington, DC 20530

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk

of the Court using CM/ECF.

/s/ Ryan D. Tansey
Trial Attorney, U.S. Department of Justice